UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MICHAEL KIRBY,

        Plaintiff,

    vs.

CITY OF EAST WENATCHEE, and
OFFICER JAMES MARSHALL,

        Defendants.

NO. CV-12-190-JLQ

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT;
AND DENYING DEFENDANTS'
MOTION TO EXCLUDE
TESTIMONY**

    **BEFORE THE COURT** are Defendants' Motion for Summary Judgment (ECF No. 75) and Motion to Exclude Testimony of Plaintiff's Blood Spatter Expert (ECF No. 86).  On March 27, 2013, the court heard oral argument on the Motion for Summary Judgment.  Julie Kays appeared on behalf of Plaintiff.  Jerry Moberg and James Baker represented Defendants.

    Through 42 U.S.C. § 1983 claims, Plaintiff asserts a violation of his Fourth Amendment right to be free from excessive force, a claim for municipal liability against the City, and state common law claims against both Defendants for negligence. (ECF No. 61, Second Amended Complaint).  Defendants' Motion for Summary Judgment seeks judgment as a matter of law on all claims. The court has reviewed the entire record, including the supplemental materials filed after the hearing on Plaintiff's state law negligence claims against the City.  The following Order is intended to supplement and memorialize the oral rulings of the court.

# I.    FACTS

This case involves Defendant City of East Wenatchee Police Officer James Marshall's intentional use of lethal force, from his perimeter position of traffic-control over 70 yards away, with a single rifle shot to the head of Plaintiff, Michael Kirby, a 49-year old man who had been contemplating suicide. The following are undisputed facts:

On April 5, 2009 around 6:39 p.m., Plaintiff's former wife, Kim Kirby, called 911, reporting that Kirby was in the living room of a house on 723 Lynn Street in the city of Wenatchee, Washington with a "revolver" to his head and in possession of a shotgun. Wenatchee Police Officers Brian Chance and Ron Wilson responded to the call at 6:40 p.m., and requested additional personnel "for containment." Wilson went to a perimeter position behind a vehicle, directly across the street from Kirby's residence, and was armed with a bean bag shotgun. He had a partial view of Kirby's front door. Chance took cover behind a van in the neighbor's driveway, East of Kirby's residence. There were shrubs and trees in Chance's line of sight.

At 6:40 p.m. dispatch updated responding officers reports that Kirby was in possession of a revolver and a shotgun, that he was "HBD" (had been drinking), and on medications. At 6:43 p.m. Chance requested responding units block off the nearby intersections of Methow Street and Lynn Street, as well as Cascade Street and Lynn Street. Chance also radioed a request for minimal use of sirens, so as to reduce the risk of agitating Kirby. (ECF No. 78, Ex. 9, Track 7). During this time, Kim Kirby exited Kirby's residence and made contact with Officer Chance.

Defendant Marshall was in the area and though he was an officer with the neighboring city of *East* Wenatchee, he was authorized to respond to the call for assistance. He arrived in his patrol vehicle at the area at approximately 6:46 p.m. He positioned himself in the intersection of Cascade and Lynn Street, facing north and in sight of the Kirby residence (3 residences and approximately over 70 yards away). Chance radioed Marshall to make him aware of the location of the Kirby residence. (ECF No. 78, Ex. 9, Track 8). Marshall's incident report indicates that upon arrival he

exited his vehicle with his patrol rifle and maintained traffic control.

At 6:49 p.m., Chance attempted several calls to Kirby's cell phone with negative results.

At 6:52 p.m., Wenatchee Police officer Tracy Martin arrived in her patrol car to relieve Officer Marshall who was detailed to another call. Upon arriving, she observed a fire truck staged to the North of Cascade Street and Hainsworth Street. Marshall and Martin had a brief discussion regarding the location of Kirby's residence and her duties at the intersection. Marshall returned to his vehicle and then opened his laptop to view his next assignment and changed his radio frequency. Officer Martin returned to her car, which she had planned to move into Marshall's position at the intersection when he left. Once inside her car, Martin looked over at Kirby's residence and saw him exit the front door and "raise a long barreled gun in [their] direction." [ECF No. 78, Ex. 3]. It is undisputed that Mr. Kirby stepped out onto his front porch, and that when he exited the house, he was carrying a shotgun in his hands. The position of the gun and Plaintiff's conduct with the gun is in dispute. Martin then "punched" the gas pedal of her car and lurched forward in order to get "out of the line of fire." *Id*.

Martin exited her patrol car in a low position and at 18:52:55 radioed her observations: "he's at the door with the gun aiming at us." (ECF No. 78, Ex. 9, Track 11). According to Martin, she observed that Marshall was not moving from his seated position inside his car with his head bent down, so she low crawled over to Marshall's driver's side door (30-40 feet away), and alerted him by banging on his window, telling him to get out of the car and that Kirby was pointing a gun at them. *Id*. Marshall exited his patrol car with his rifle. Martin crouched low taking cover behind the engine of Marshall's car. Marshall then rose from his squatted position, aimed and fired one shot striking Kirby in the left side of the face. According to 911 radio entries, "Shots fired Rivercom. Suspect down" was radioed at 18:53:15, just 20 seconds after Martin's earlier radio traffic.   (ECF No. 78, Ex. 9, Track 11 (00:51)).

Marshall admitted during his deposition that he opted not to maintain a position

of cover (as was Martin).  (ECF No. 90 at 221). Instead, Marshall's incident report states:

> I looked toward the suspect's house and saw a white male on the porch shouldering a long gun at me. I could see that the weapon was made of wood composite. I could also see clearly that the weapon was shouldered and in the aiming position ready to fire....I raised my rifle to the shouldered position...and acquired him in my sights. I could clearly see that the suspect was pointing his rifle at me and that we were now facing barrel to barrel.

After being shot, Kirby was transported to a local hospital.  The bullet shattered his jaw, and left Kirby with a life altering disability severely hindering his ability to eat, drink and speak.  An Ithaca Model 37 12-gauge pump shotgun was seized from the scene.

Plaintiff's account of the incident varies from Marshall's.  His declaration states that after he stepped out onto his front porch holding a shotgun in his hands, an officer began speaking with him from behind a large tree in his yard.  (ECF No. 90, Ex. 1). Officer Chance denies having any conversation with Kirby between the time he arrived and the time of the shooting.   However, Kirby asserts the officer convinced him that his "life was worth living" and instructed him to put down the shotgun.

> I told him that I was concerned that the shotgun's sensitive mechanism would cause it to go off after I put it down, and that I had to remove a bullet from the chamber before putting the gun on my porch.  While the shotgun remained pointed vertically toward the sky, I used my right hand (index finger) to release the bullet from the chamber.  The gun remained in a vertical position while I did that.  I turned away from the direction of the tree and turned to my left, setting the gun (still pointing up) next to the right side of my front door.  I then turned and began facing the direction of the tree when I suddenly felt the blow of Marshall's rifle shot to the left side of my face and fell down.

*Id.*

Witnesses located at the Preciado residence directly across the street from Kirby's residence also provide varying accounts.  Aida Preciado watched the incident from an upstairs living room window, which has a direct view of the Kirby's front porch.  Ms. Preciado states in her declaration she saw Kirby on the front of the house with a gun pointed "straight up to the sky" and that she never saw Kirby point or aim the gun at anyone.  (ECF No. 90, Ex. 13 at 171).

Marco Preciado states in his Declaration that he heard an officer yell something like "come out with your hands up" and something like "you're going to get shot" and

ORDER - 4

then witnessed Kirby come out on to the front step with a weapon on his right side "pointed up towards the sky." He recalls hearing an officer telling Kirby "about a beanbag gun," "they did not want to use it on Mike," and tell Mike to come talk to him. He then recalls watching Kirby put his left hand toward the middle of the weapon, then slightly lower the gun a few inches down. He heard a shot and saw Kirby fall to the ground and the gun drop from his hand. His Declarations states he "never saw Mike aim his gun at anyone."

Cristhian Preciado recounts also watching Kirby walk out his front door with a rifle "angled slightly downwards." He states he never saw Kirby point the gun at anyone nor "aim the gun, as if in a shooting position," nor "aim the weapon up the street towards Cascade and Lynn." (ECF No. 90, Ex. 14 at 175).

*b.    After the Shooting*

Both the Wenatchee and East Wenatchee Police Departments investigated the shooting and concluded Marshall's use of force was reasonable. No discipline was imposed.

On June 9, 2010, the Chelan County Prosecuting Attorney filed a criminal Information against Plaintiff, which stated:

> That the said defendant,...on or about the 5th day of April, 2009, did then and there unlawfully, feloniously and intentionally assault an employee of a law enforcement agency who was performing his [sic] official duties at the time of the assault: Officer Tracy Martin of the Wenatchee Police Department; contrary to the form of the statute RCW 9A36.031(1)(g) in such cases made and provided against the peace and dignity of the State of Washington.

ECF No. 78, Ex. 4. Plaintiff pleaded guilty to Assault in the Third Degree by Alford plea. In his Statement on Plea of Guilty, Plaintiff admitted:

> The judge asked me to state what I did in my own words that makes me guilty of this crime. This is my statement: I held a gun in my hands while standing on my front porch. I was distraught and confused. I put the gun down but the officers were concerned for their safety. One of them shot me. I did not intend to harm anyone.

ECF No. 78, Ex. 5. Chelan County Superior Court entered a felony judgment and sentenced Plaintiff to 12 months probation.

*c.    Training and Policies*

ORDER - 5

Marshall attended the Reserve Police Officer Academy through Tacoma Community College from March 2000 to September 2000.  From May to June 2002, he worked as a reserve police officer for the Coulee Dam, Washington Police Department.  From July 2003-April 2007, he worked for the Clyde Hill, Washington Police Department. He attended the Washington State Basic Law Enforcement Academy from March 2004 to August or September 2004.  From April 2007-May 2008 he worked for the Medina, Washington Police Department, and left there for employment with the East Wenatchee Police Department. Marshall had training on the use of force, including 16 hours of crisis intervention at the Police Academy and 20 hours of crisis intervention at the Reserve Academy. He attended a course in August 2006 titled "Interacting with Persons with Developmental Disabilities and Mental Illness."  He estimated he had over 100 hours of training on the use of force.

Unlike the Wenatchee Police Department, the City of East Wenatchee did not have a specific written policy or procedure for interaction with suicidal or depressed subjects until November 2012, at which time the City's General Orders Manual was amended to include such a provision. In the four-year period from 2006 through 2009, the department averaged 75 "mental health assists" per year.

East Wenatchee Police Chief Randy Harrison testified at his deposition that in his role as Chief he was responsible for establishing policies and procedures for the police department.  During his tenure as Chief from 1995 to 2012 the department never held any training for their officers on the subject of interacting with mentally ill people. He testified in his deposition that he "did not until last fall begin to think about a policy a...written policy, on dealing with the mentally ill."  He acknowledged that his department provided annual training on firearms tactics, blood borne pathogens and use of force, and that the use of force training was immediately prior to firearms instruction, lasted ten minutes, and consisted of officers reading the use of force policy to themselves from the General Orders Manual.

East Wenatchee Police Department Policy provides that "[t]he protection of life

is at all times more important than either the apprehension of criminal offenders of the protection of property.  The member's responsibility to protect life must include his/her own life."; "The use of Deadly Force is authorized...In all cases, use of force is limited to the reasonable amount of force necessary to lawfully accomplish arrest, overcome resistence to arrest, defend you from harm or to control a situation."; "Deadly force may only be used under the following circumstances: A. When reasonably necessary to protect the member or others from what he or she reasonably believes is an imminent threat of death or serious physical injury."

Both sides have proffered experts in police policies and practices, as well as in blood stain analysis, whose reports are included in the record and discussed in more detail in the context of the court's analysis below.

## II.    SUMMARY JUDGMENT STANDARD

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* When parties submit cross-motions for summary judgment, as here, the Court must consider each motion on its own merits. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  In addressing the parties' cross-motions for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 255 (1986)**.**  Nevertheless, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 248.  Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits its own evidence to the contrary.

## III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    **A.    *Heck v. Humphrey***

2    Defendants first argue Plaintiff's excessive force claim is barred under *Heck v.*

3    *Humphrey*, 512 U.S. 477, 487 (1994), where the Supreme Court held that Section 1983

4    plaintiffs are barred from advancing claims that, if successful, "would necessarily

5    imply the invalidity" of a prior conviction or sentence.   Defendants contend that

6    Plaintiff's conviction for Third Degree Assault would be rendered invalid if he prevails

7    on the claim.

8    Kirby pleaded guilty to Third Degree Assault in Chelan County Superior Court

9    in violation of RCW 9A.36.031, which provides:

10   (1) A person is guilty of assault in the third degree if he or she, under
     circumstances not amounting to assault in the first or second degree:
     ...
11   (g) Assaults a law enforcement officer or other employee of a law enforcement
12   agency who was performing his or her official duties at the time of the assault...

13   RCW 9A.36.031.  Because "assault" is not defined in the statute, courts resort to the

14   common law definitions. *State v. Byrd*, 125 Wash.2d 707, 712, 887 P.2d 396 (1995).

15   In Washington, the common law definition of assault encompasses: "(1) an attempt,

16   with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching

17   with criminal intent; and (3) putting another in apprehension of harm whether or not

18   the actor intends to inflict or is incapable of inflicting that harm." *State v. Walden*, 67

19   Wash.App. 891, 893–94, 841 P.2d 81 (1992). Specific intent is an essential to all forms

20   of assault.  A person must have intended to cause bodily harm or specifically intended

21   to create an apprehension of bodily harm.

22   The Information to which Kirby entered his Alford Plea states in relevant part

23   that Kirby "did...unlawfully, feloniously and intentionally assault an employee of a law

24   enforcement agency who was performing his official duties at the time of the assault,

25   to wit: Officer Tracy Martin of the Wenatchee Police Department..." (ECF No. 78, Ex.

26   4).  As part of his Alford plea, Kirby admitted: "I held a gun in my hands while

27   standing on my front porch.  I was distraught and confused.  I put the gun down but the

28   officers were concerned for their safety.  One of them shot me. I did not intend to harm

anyone." (ECF No. 78, Ex. 5).

The critical question here is whether a jury's finding that Marshall's use of force was objectively unreasonable would necessarily call into question the validity of Kirby's conviction for third degree assault upon Officer Martin? If it is possible for Kirby to have assaulted Martin and for Marshall's shooting of Kirby to have been objectively unreasonable, then *Heck* does not bar Kirby's claim.

In addressing the scope of *Heck,* the Ninth Circuit in *Smith v City of Hemet* recognized that an allegation of excessive force by a police officer would not be barred by *Heck* if it were distinct temporally or spatially from the factual basis for the person's conviction. 394 F.3d 695, 699 (9th Cir. 2005). The court noted that the plaintiff would be allowed to bring a § 1983 action, if the use of excessive force occurred *subsequent* to the conduct on which his conviction was based." *Id.* at 698 (emphasis added). Here, Plaintiff attempts to temporally distinguish the facts by contending that whatever the basis for Kirby's assault on Officer Martin, it was complete *before* Marshall's use of force, and therefore a jury's determination that the officer's actions were unreasonable *after* Martin sensed the harm would not be inconsistent with the assault conviction. The court agrees.

A third degree assault conviction does not require a firearm to have been pointed at a victim in order to put another in apprehension of harm. The elements of third degree assault upon Martin were satisfied in the moment Kirby wielded the gun *within the sight* of Officer Martin, while she was seated in her own patrol car and over twenty seconds prior to the shooting. From then on, Martin remained out of Kirby's sight. In this case, it will be for the jury to determine the circumstances thereafter facing *Marshall* after Martin spoke to him, after he exited his own vehicle, and after he decided to obtain Kirby in his sight instead of maintaining a position of cover. A finding that Marshall's use of force was unreasonable would not imply that Plaintiff did not put Martin in fear of harm when she saw him with the gun.

The nature of Kirby's conviction and these facts distinguish this case from the

ORDER - 9

single provocative act or single transaction cases applying *Heck*. This case is more factually analogous to *Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006), where the Plaintiff was also a suicidal man with a rifle who was shot in the face by the Defendant officer, after driving through town and firing his rifle near responding police officers. The plaintiff entered into an Alford plea to a simple assault on a *different* police officer admitting only that he had put that officer in fear and that he fired his rifle several times while near law enforcement officers. Critical to the court's decision was that the plaintiff's behavior satisfied the elements for simple assault both before and after the Defendant Officer had arrived at the scene. The Fifth Circuit held Plaintiff's claim was not barred by *Heck* as it was possible that both the Defendant's shooting of the Plaintiff was objectively unreasonable, and that the Plaintiff had assaulted the other officer by pointing the gun in that officer's direction and firing the gun in the presence of law enforcement.

As in *Ballard*, the court concludes Plaintiff's claim for excessive force is not barred by *Heck v. Humphrey*.

## B.    § 1983 Excessive Force - Qualified Immunity

Under 42 U.S.C. § 1983, police officers, as representatives of the government, are liable for the deprivation of rights guaranteed by the Constitution. However, 42 U.S.C. § 1983 does not create substantive rights, but rather provides remedies for deprivations of other constitutional rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). A police officer is entitled to qualified immunity unless his conduct violates clearly established rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, and it offers immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Courts employ a two-step analysis to determine whether a government official is protected by qualified immunity. The first part of the analysis is to determine whether the facts alleged show the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Next, the court

must determine whether the constitutional right at issue was clearly established. *Id.* Both steps of this analysis must be conducted in the light most favorable to the *Plaintiff.*

**1. Violation of a Constitutional Right**

Both parties agree that the use of excessive or deadly force under § 1983 invokes the Fourth Amendment's guarantee of the right to be free from unreasonable seizures. To establish an unconstitutional seizure, a plaintiff must prove that his person was seized and that seizure was unreasonable. See generally, *Katz v. United States*, 389 U.S. 347 (1967). Neither party disputes that Marshall's use of lethal force against Kirby constituted a seizure of his person. The use of deadly force by a police officer is a seizure. The right to be free from excessive force is a clearly established right protected under the Fourth Amendment's prohibition of unreasonable seizures. However, the parties contest the reasonableness of Marshall's actions, with Defendants averring his use of deadly force was reasonable and Plaintiff claiming it was unreasonable.

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at 396 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. Reasonableness therefore must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id*. at 396, (*citing Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

The analysis involves three steps. First, the court must assess the severity of the

intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.' " *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir .2010) *(quoting Miller v. Clark Cnty*., 340 F.3d 959, 964 (9th Cir. 2003)). "[E]ven where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The second step, requires an evaluation the government's interest in the use of force. *Graham*, 490 U.S. at 396. Finally, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964.

In addition to the major *Graham* factors, the Ninth Circuit has noted a number of other factors relevant to a *Graham* analysis. Mental illness "is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.*" Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir.2003) (internal citation omitted). Courts must consider whether reasonable officers would have been aware that the suspect is an "emotionally distraught individual" as opposed to "an armed and dangerous criminal,*" Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001); *see also Glenn v. Washington Cty*., 673 F.3d 864, 874 (9th Cir. 2011) (holding that the fact that "[the victim]'s family did not call the police to report a crime at all, but rather to seek help for their emotionally disturbed son" was relevant to a Graham analysis). Further, although officers are not required to use the absolute minimum force necessary to subdue a suspect, before using force they must consider "the availability of alternative methods of capturing or subduing a suspect." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005).

a. *Quantum of Force*

There can be no dispute the nature of the intrusion on Kirby's Fourth Amendment interests was significant requiring a correspondingly significant justification. There is no dispute that Marshall intentionally used deadly force when he aimed and shot Kirby from over 70 yards away. The use of a firearm as deadly force is governed specifically by *Garner* and its progeny  When a suspect is not attempting

to escape, the Ninth Circuit has emphasized that an officer may not fire "unless, at a minimum, the suspect presents an *immediate* threat to the officer or others." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (emphasis added).

Defendants contend that Kirby posed an immediate threat of serious injury "to Officer Marshall, Officer Martin and others including members of the public." However, this is presuming Marshall's account that he was "barrel to barrel" with Kirby is true. However, viewing the evidence in the light most favorable to *Plaintiff*, as the court must at this stage, there is an undeniable question of fact on whether there was an immediate threat of harm. Plaintiff's account suggests he was not aiming at or threatening anyone and that Marshall rose up to expose himself and use lethal force without consideration of any alternative. Plaintiff's account has its own support in the record beyond his own affidavit, including the testimony of eye witnesses and the testimony of blood spatter expert Ross Gardner.

Both the Ninth Circuit and the Supreme Court have noted that even when circumstances dictate that an officer may use a firearm, "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d at 1201 (*citing Garner*, 471 U.S. at 11–12). The Ninth Circuit has defined the warning required before using force—even force that does not qualify as deadly force—as a "warning of the imminent use of such a significant degree of force." *Deorle*, 272 F.3d at 1285. It is undisputed that there was no warning provided by Marshall to Kirby, nor did Marshall warn fellow officers of his intent. The parties have hired police practices experts who disagree as to whether any form of warning was appropriate and whether an alternative was available.

### b. Government's Interest in the Use of Force

The governmental interests at stake are measured by evaluating a range of factors including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight, and any other exigent

circumstances that existed at the time of the arrest. *Deorle*, 272 F.3d at 1279–80.

The character of the offense is often an important consideration. In this case, officers were not called to make an arrest of an armed and dangerous criminal, but to help a suicidal person in a mental health crisis. They were aware he had been drinking and was on medication. They were not investigating a crime.

As to the immediacy of the threat, there is a material issue of fact as to whether Plaintiff was or was not displaying the gun in a threatening manner and whether he was being compliant in putting the weapon down or whether he was "barrel to barrel" with Marshall threatening the safety of those in the area. Plaintiff and witnesses say he was not. Defendants allege he was. The resolution of this question rests entirely on whose version of the story a fact-finder deems more credible.

### c. Balancing the Need for the Intrusion

In light of the foregoing analysis, the balancing task articulated by *Graham* must be completed by a jury in this case. Unresolved factual questions are crucial to evaluating the first and second subfactors in assessing the government's interest. Defendants' argument presumes their version of the facts are correct. However, a reasonable fact finder could conclude, taking the evidence most favorable to Plaintiff, that Marshall's use of force was unreasonable, and therefore excessive. As the court cannot conclude as a matter of law that Marshall's conduct was reasonable, Defendants are not entitled to summary judgment on Plaintiff's claim of excessive force.

### 2. Clearly Established Right

Having determined that Plaintiff has alleged a Fourth Amendment violation, the next question under the second *Saucier* prong is whether Defendant Marshall is nonetheless entitled to qualified immunity. That is, even assuming there was a constitutional violation, Marshall contends he is still entitled to qualified immunity because "[i]t cannot be said that 'every reasonable' police officer in Marshall's position would have understood that using deadly force on plaintiff was a violation of

plaintiff's constitutional rights."

A government official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (modification in original) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Although the Supreme Court does "not require a case directly on point" to define the right at issue and the violation of that right, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd,* 131 S.Ct. at 2083. Whether the law was clearly established is an objective standard.

The parties have engaged experts on police practices.  Defendants rely upon Thomas Ovens (ECF No. 78, Ex. 23) who opines that a reasonable officer would believe that Marshall acted reasonably in employing deadly force (even though "it was not Officer Marshall's role to resolve the crisis situation..."). Plaintiff's policies and practices experts include T. Michael Nault and Susan Peters (ECF No. 90, Ex. 8). Peters opines that there were reasonable alternatives short of the use of lethal force available to Marshall, while the defense expert opines there were not.  Peters also opines Marshall put himself in a vulnerable position, did not consider alternatives, and failed to adhere to basic law enforcement principles in doing so.

The law regarding excessive force for a law enforcement officer was clearly established at the time of this incident by *Graham* and its progeny in the Ninth Circuit. Here, Plaintiff had a clearly established constitutional right to be free from the use of excessive force.  As recognized in *Doerle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001), every police officer should know that it is objectively unreasonable to shoot "an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree

of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals."  Here, according to Plaintiff, all of these factors were present.  He claims he was complying with instructions to put his weapon down and was responding to the Wenatchee officers trained in resolving such situations.  The unresolved material issues of fact as to whether there existed excessive force, are also "material to a proper determination of the reasonableness of the officers' belief in the legality of their actions." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).  Accordingly, the court must deny Defendants' Motion for Summary Judgment based upon qualified immunity.  *See generally, A.D. v. Cal. Highway Patrol*, --- F.3d ----, 2013 WL 1319453 (9th Cir. 2013)(affirming denial of qualified immunity raised in post-verdict motion after jury found officer had fatally shot suspect with the purpose to harm and without a legitimate law enforcement objective).

**C.    Municipal Liability Under § 1983**

In order to establish a claim against a municipality under § 1983, a plaintiff must show that he was deprived of his constitutional rights and that this deprivation was proximately caused by an official policy, custom or practice, that amounts to deliberate indifference. *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 690–91 (1978). Plaintiff herein seeks to establish municipal liability based on three alleged omissions: 1) the failure to offer any training to officers on responding to individuals facing a mental health crisis; 2) the failure to adequately train on the use of lethal force; and 3) the failure to adopt and implement policies on dealing with the mentally ill.  Plaintiff alleges that this "institutionalized ignorance" resulted in Marshall's "improper handling of" and use of force against Kirby, and that such a confrontation was foreseeable, avoidable, and ultimately caused the deprivation of Kirby's rights against unreasonable seizure.

Pursuant to *Monell*, a public entity defendant cannot be held liable under a theory of respondeat superior; rather, a defendant must act as a lawmaker or one

"whose edicts may fairly be said to represent official policy." *Id.* at 693. A plaintiff may establish the policy, practice, or custom requirement for municipal liability under 42 U.S.C § 1983 through proof that (1) a public entity employee committed the alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom, which constitutes the standard operating procedure of the local government entity; or (2) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action. *Avalos v. Baca*, 596 F.3d 583, 587–88 (9th Cir. 2010). To prevail on a municipal liability claim, a plaintiff must show

> (1) plaintiff's constitutional rights were violated,
> (2) the municipality had customs or policies in place at the time that amounted to deliberate indifference, and
> (3) those customs or policies were the moving force behind the violation of rights.

*See Estate of Amos ex. rel. Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001).

As the court has already concluded a question of fact exists as to whether the Plaintiff's constitutional rights were violated, the court focuses here on the deliberate indifference element, which requires a high degree of culpability on the part of the policymaker and is an onerous burden for a plaintiff. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm 'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011). "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.' " *Id.* (*quoting City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)). "A less stringent standard of fault for a failure-to-train claim 'would result in de facto respondeat superior liability on municipalities....' " *Id.* (*quoting City of Canton*, 489 U.S. at 392); *see also Pembaur*

1  *v. Cincinnati*, 475 U.S. 469, 483 (1986) (opinion of Brennan, J.) ("[M]unicipal liability
2  under § 1983 attaches where—and only where—a deliberate choice to follow a course
3  of action is made from among various alternatives by [the relevant] officials....").

4      The required level of notice to demonstrate deliberate indifference is rarely
5  demonstrated by a single incident of constitutionally deficient action or inaction.
6  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  Actual or constructive notice of
7  the need for a particular type of training may be plainly obvious where a pattern of
8  constitutional violations exists such that the municipality knows or should know that
9  corrective measures are needed.  Here, as noted by the City, Plaintiff lacks any
10 evidence of other prior incidents of excessive force involving the mentally ill, and
11 cannot establish an ongoing pattern of misconduct.  The City therefore contends
12 Plaintiff therefore lacks evidence the City had notice its policies would result in the use
13 of lethal force against suicidal subjects.

14      Instead of relying upon a pattern of similar violations, Plaintiff relies on the
15 "single incident liability" that the Supreme Court  hypothesized about in *City of*
16 *Canton v. Harris*, 489 U.S. 378 (1989) and discussed in *Connick v. Thompson*, 131
17 S.Ct. 1350 (2011).  These cases left open the possibility, that the unconstitutional
18 consequences of failing to train could be so patently obvious that a city could be liable
19 under § 1983 without proof of a pre-existing pattern of violations. As an example, the
20 Supreme Court in *Canton* referenced the obvious need to train police officers on the
21 constitutional limitations on the use of deadly force, when the city provides the officers
22 with firearms and knows the officers will be required to arrest fleeing felons. *Id.* at 390
23 n. 10.  In *Connick*, the Court rejected the notion that the failure to provide additional
24 training of prosecutors in their *Brady* obligations falls within this narrow range of
25 potential liability theorized in *Canton,* in part because lawyers are trained to be able
26 to obtain the legal knowledge that is required to perform their jobs.

27      The Supreme Court also denied certiorari in a Fifth Circuit case raising a similar
28 challenge to the claim made here.  In *Valle v. City of Houston*, the Plaintiffs alleged the

City was liable for failing to adequately train its patrol supervisors in crisis intervention team (CIT) tactics for working with the CIT trained officers. 613 F.3d 536 (5th Cir. 2010). Plaintiffs presented sufficient evidence that the chief was aware of the need for training related to mental health (as there had been policy proposals previously considered) and that there were recurring situations involving mental health crises. The Valle plaintiffs claim failed because they did not present sufficient evidence of deliberate indifference showing there was an obvious need for more training. The court held that Plaintiffs could not demonstrate that the shooting of their mentally ill son was a "highly predictable consequence" of sending the non-CIT officers in response to their call for help.

Plaintiff Kirby's evidence to establish his failure-to-train theory is narrow. Plaintiff does not argue that the basic and field training police officers receive in the state of Washington is insufficient as a matter of content; Plaintiff presents no evidence of any past specific proclivities of Defendant Marshall; and it is undisputed that prior to Kirby's shooting Chief of Police John Harrison never analyzed, considered, addressed or contemplated separate training or drafting a policy regarding the mental ill. He testified that he reviewed every report of his officers and none suggested to him his officers were acting inappropriately.

Nevertheless, unlike in *Valle*, the facts of this case involve a complete absence of any policy and the complete absence of any training in dealing with persons in a mental health crisis. Plaintiff has produced data on the relative frequency with which the City's officers encountered mentally ill people. Plaintiff also has produced police practices experts, including T. Michael Nault, who makes the observation that law enforcement's response to people mental illness has become an issue of national concern. Nault opines that due to the foreseeability of encounters with the mentally ill, "the need for policy and training is profoundly evident" and that the City's failure to have policies and training regarding handling mentally disturbed persons and more training on the use of deadly force, failed to comply with generally accepted police

practices and standards of care articulated by the International Association of Chiefs of Police and other publications.  Plaintiff's experts' opinions on the appropriate de-escalation and scene evaluation practices in dealing with the mentally ill contradict the training Marshall states in his Declaration that he received and relied upon "that once someone aimed a firearm at me or another...this is an act of use of deadly force and I should respond immediately."  Additional evidence of "obviousness" presented by Plaintiff includes the fact that the adjacent city of Wenatchee had a policy on encounters with the mentally ill, as well as the post-incident fact that the Defendant City eventually did in fact adopt a written policy.

The court has reviewed the large body of municipal liability jurisprudence shedding light on the issue of deliberate indifference in the context of tragic encounters between police officers and mentally ill individuals.  Construing the facts in the light most favorable to Plaintiff, the court concludes Plaintiff's claim falls within the narrow range of circumstances in which a City's failure to address encounters with mentally ill either in a written policy or in its training may reasonably be seen by a jury as deliberate indifference to a foreseeable need.  *See Newman v. San Joaquin Delta Community College Dist*., 814 F.Supp.2d 967 (E.D.Cal. 2011)(failure to have any continuing education training on handling mentally ill people and the failure to address the issue at all in the police manual created at least triable issues). Ultimately, there are questions of fact as to whether the need for additional training was so patently obvious so as to raise the City's neglect to the level of deliberate indifference; whether the failure to have a policy on such interventions would likely result in officers making choices in violation of constitutional rights; and whether these failures were the "moving force" behind Kirby's constitutional rights violation.

**D.    State Law Claims**

**1.    Negligence Claim Against Marshall and Vicarious Liability Against the City**

As there are questions of fact as to the resolution of Plaintiff's excessive force

claim (as discussed above), Defendants' Motion for Summary Judgment is denied as to the state law claim negligence claim against Marshall and *vicarious liability* claim against the City.

**2.    Negligence Against the City for Failure to Train**

The Second Amended Complaint also alleges the City was negligent in failing to properly train, supervise and adopt policies and customs "to protect the citizens whom its EWPD employees are assigned to serve." (ECF No. 61 at 13-14). In its Motion for Summary Judgment, the City contended this claim should be dismissed under the discretionary governmental immunity and public policy doctrines, and for lack of evidence of a failure to train and proximate cause. The court inquired of this claim at the hearing and requested supplemental briefing from the parties. Interestingly, Plaintiff's supplemental brief states that his negligence claim against the City is *not* based upon any inaction by the City (or nonfeasance) and the brief only describes a claim based upon respondeat superior (the "failure to act with reasonable care during their interactions with *Michael Kirby*."). Plaintiff apparently concedes the dismissal of the claim against the City based upon a negligent failure to train, which as Defendants point out would clearly be labeled an omission. In any case, Washington tort law does not permit individual negligence claims against a government entity predicated upon a duty to the general public or "predicated on their *failure* to take affirmative action..." *Coffel v. Clallam County*, 47 Wash.App. 397, 735 P.2d 686 (1987)(emphasis in original); *Robb v. City of Seattle*, 295 P.3d 212 (2013).

**E.    Conclusion**

This case is necessarily fact-intensive and as such, difficult to resolve on summary judgment. Remaining questions of material fact material to the qualified immunity, *Monell* liability, and state law negligence determinations preclude summary judgment. Accordingly, as set forth above, Defendants Motion for Summary Judgment is denied except as to Plaintiff's state law claim against the City based upon the alleged failure to train.

**IV.    MOTION TO EXCLUDE TESTIMONY OF BLOOD SPATTER EXPERT**

Defendants separately move the court to exclude the testimony of Plaintiff's "blood spatter" expert, Ross Gardner.

**A.    Legal Standard**

Federal Rule of Evidence 702 provides as follows:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court identified four non-exclusive factors that may be helpful to the court in assessing the relevance and reliability of expert testimony, including (1) whether a theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id*. at 593–94.

In its "gate-keeping" role, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). That said, the Daubert factors do not constitute a "definitive checklist or test." *Id*. at 150. Indeed, the court's fundamental objective is to generally evaluate, based on whatever factors are important to the particular case, the relevancy and reliability of the testimony and not necessarily to explore factors that might not be relevant to a particular case, such as whether the expert's methods are subject to empirical testing. *Id*. at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his or her field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

The proponent has the burden of establishing that the pertinent admissibility requirements have been meet by a preponderance of the evidence. Fed.R.Evid. 104.

**B.    Discussion**

Ross Gardner is a consultant in crime scene reconstruction and bloodstain pattern analysis. He teaches nationwide, has been retained as an expert witness in other cases, authored three reference books on the subject of crime scene analysis, and written multiple peer-reviewed journal articles on the methodologies for both disciplines. Defendants do not challenge Mr. Gardner's qualifications.

Mr. Gardner was hired by Plaintiff to analyze the crime scene "artifacts" with the following investigative question: "Is there evidence supporting the statement that Mr. Kirby was holding a long gun (shotgun) in an elevated, firing position at the time of his wounding?" (ECF No. 90, Ex. 9). Gardner obtained and reviewed digital crime scene photographs, EMT statements, selected medical records of Kirby, the gun Kirby possessed on the porch (Ithaca Model 37 12-gauge shotgun), and the two shirts he was wearing at the time of his wounding.

Gardner performed a blood stain analysis using what he referred to as "standard Event Analysis methodology." As to the condition of the two shirts, his report states:

> The post-condition of the two shirts worn by Mr. Kirby shows evident radiating spatter on both shirts. Some of these stains are directional while others are not. The specific source event of these stains is limited [sic] one of two possibilities: a) Impact spatter resulting from the gunshot or b) Expectorate stains from Mr. Kirby breathing subsequent to injury.

The report also finds:

> Examination of the left sleeve of the black t-shirt, resulted in locating a single directional spatter on the lower aspect of the t-shirt. However the directional orientation was downward and not outward. The upper aspects of the sleeve as well as the left front shoulder were void of spatter.
> ...
> Several small spatter were located in lower areas on the left side of the t-shirt and are consistent with expectorate stains raining down from above as Mr. Kirby was breathing at some point.

As to the condition of the gun, his report states:

> I found no evidence of patent spatter or skeletonized spatter on the weapon. It should be noted that the single stain observed in Image 0020...was no longer present. A swabbing of the left side of the stock and receiver of the shotgun failed to react to a presumptive test for blood.

ORDER - 23

The photograph of the base of the stock of the shotgun shows what appears to be a single directional spatter.   This stain is positioned behind the base of the stock grip, and crosses the base of the weapon, rising onto the right side.

Gardner then hypothesizes two scenarios: 1) Kirby holding a long gun in firing position (elevated, right side of his face against the stock) at the time of his wounding; and the inverse, 2) Kirby "not holding a long gun in firing position."  As to each "hypothesis," Gardner predicts a likely spatter trajectory if spatter were present.  In the first scenario, Gardner predicts:  the left side of the weapon "will be exposed to directional spatter...with the long axis of the spatter oriented primarily toward the muzzle of the gun"; the left anterior sleeve and front left shoulder of Kirby's shirt will be exposed to directional spatter; and possibly, the right shoulder will not have directional spatter (other than downward) present on it, as it should be protected by the stock of the weapon."

As to the scenario where Kirby was not holding a gun in firing position, Gardner surmises: the left sleeve and left shoulder of his shirt, as well as the left side of the weapon, will not be exposed to directional spatter from the impact or immediate expectorate activity; and the weapon may have directional expectorate spatter from being in close proximity to Kirby after his wounding.

Gardner then analyzed whether the blood stains on the gun and the shirts aligned with any of his "predictions."  Ultimately, Gardner concluded that based on the available documentation "there is no physical evidence supporting a standing point-shoulder firing position and no evidence refuting that the weapon was positioned in some other orientation at the moment of wounding."

Defendants' initially contend Mr. Gardner's testimony should be excluded because he "based his opinions on blood stains on plaintiff's shotgun and clothes" and "completely ignored the testimony of neutral witness Officer Tracy Marshall of the Wenatchee Police Department and contemporaneous radio recordings seconds before and after the shooting."  (ECF No. 86 at 2).  However, the nature of expert witness testimony is specific to their expertise. The fact that an expert's

expertise and analysis is specific to discrete topics is the nature of scientific analysis, and is not grounds for exclusion.

Next, Defendants contend Gardner's opinion should be excluded because it is unreliable due to questions concerning the integrity of the blood stains and chain of custody of the gun. Chain of custody evidence is a legal inquiry relevant to authenticity of the underlying subject matter. Normally it goes to weight not admissibility of evidence.

Defendants lastly argue that Gardner's opinion is nothing but conjecture and about mere possibilities. In their Reply, Defendants quote from Gardner's own book and contend he violated "one of his own cardinal rules of blood stain analysis": the presence of spatter resulting from gunshot for head wounds cannot be predicted. Defendants have also supplied the report of their own blood stain expert, Det. Donald Ledbetter, who is critical of numerous aspects of Gardner's report. (ECF No. 97, Ex. 25). Det. Ledbetter opines that, at best, the blood stain evidence is inconclusive as to all hypotheses.

The court will not engage in a credibility analysis of the competing experts. To do so would amount to improper fact-finding. In the case of conflicting expert opinions, it is for a jury to evaluate what weight and credibility each expert opinion deserves. Given the capabilities of jurors and the liberal thrust of the rules of evidence, any doubt regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion. Accordingly, the court denies Defendants' Motion to Exclude the Testimony of Ross Gardner.

## V.     CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Summary Judgment (ECF No. 75) is **DENIED**, except it is **GRANTED** as to Plaintiff's state law negligence claim asserted against the City in the Second Amended Complaint predicated upon the failure to train.

2. Defendants' Motion to Exclude Testimony of Blood Spatter Witness (ECF

No. 86) is **DENIED**.

    The Clerk of the Court shall enter this Order and provide copies to counsel.

    Dated this 10th day of April, 2013.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 26